IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CARLINE BALBUENA,

    Petitioner,      No. 2:11-cv-1234 MCE EFB P

  vs.

WALTER MILLER, Warden,

    Respondent.    <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

   Petitioner is a state prisoner without counsel proceeding with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges a 2008 judgment of conviction entered against her in the Sacramento County Superior Court on charges of first degree murder, assault on a child resulting in death, and felony child endangerment.  She raises three claims of jury instruction error and one claim of ineffective assistance of trial counsel.  Upon careful consideration of the record and the applicable law, the undersigned recommends that petitioner's application for habeas corpus relief be denied.

////

////

////

////

I.      **Factual Background**[1]

Either defendant Carline Balbuena, whose self-chosen rummy name was "Queen of the Damned," or codefendant James Morris, aka "Ultimate Evil," delivered the fatal blows to Balbuena's three-year-old son, Keith Carl Balbuena (KC).  Because separate juries convicted them both of murder, we cannot ascertain from the verdicts who perpetrated and who aided and abetted the murder, particularly in light of overwhelming evidence that either or both abused the child over a long period of time, and either or both of them could have caused his tragic death.  We affirmed codefendant Morris's conviction.  (*People v. Morris* (Oct. 5, 2009, C058388) [nonpub. opn.].)  With minor modifications, we will use our same summary of the facts.

Balbuena complains she was denied her constitutional right to competent counsel because her lawyer failed to hire an expert on intimate partner battering (IPB).  She also urges us to reverse the judgment for an assortment of instructional errors.  We accept the Attorney General's concession she is entitled to presentence custody credits and amend the abstracts of judgment to clarify that there is only one restitution and one parole revocation fine.  In all other respects, we affirm the judgment.

By 8:00 p.m. on November 18, 2005, three-year-old KC was brain dead.  A day earlier, paramedics observed severe bruising on his head, torso, chest, pelvis, and leg.  The child was unresponsive.  The emergency room doctor believed KC had been assaulted as he had a large amount of blood between his brain and his skull, pushing the brain to one side; a large amount of fluid in his abdomen; and a possible liver laceration.  It appeared his kidneys had not been functioning normally for at least 24 to 48 hours.  He also had a healing burn injury on the sole of his foot.

A surgeon drilled a hole in KC's skull and removed a bone to evacuate blood and relieve the pressure.  Retinal hemorrhages in his right eye suggested his head had been shaken and hit very hard against a surface.  According to a pediatrician specializing in child abuse, these injuries could not have been sustained from falling from a crib or other household fall; they would require "very significant force" generally associated with falls from major heights or motor vehicle accidents.  In his expert opinion, the injuries, including those to KC's abdomen, were intentionally inflicted and the result of abuse.

---

[1]  In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual summary.

2

The pathologist opined that the cause of death was blunt force injuries to the head, torso, and abdomen.  If the head injury had not killed KC, the abdominal injuries would have.  The discoloration along his cheek and lower border of one eye was consistent with having been struck in the eye and was not typical of a fall.  Bruising was extensive, including a bruise on his forehead, three bruises on his chest, a bruise on the front of the left leg, a cluster of bruises on the inside of the left knee, a bruise on the top of his left foot, a bruise on the instep of the left foot, a bruise on the back of his right ankle, two bruises on his left arm, a bruise on his right forearm, a bruise in the muscle of his left buttock, and bruises on his right upper thigh and left hip.  The force required to sustain the abdominal injury would have been a "kick or punch that goes up ... into the belly."  The pathologist did not believe the administration of CPR could have caused the abdominal injury.  A child who had sustained these abdominal injuries would have had symptoms including nausea, vomiting, pain, and listlessness.

The emergency personnel were not the first to observe evidence of abuse.  Morris and his three-year-old daughter, H., moved into Balbuena's apartment in August 2005 to share expenses.  Balbuena, with the help of a child care subsidy, enrolled her two children, KC and his one-year-old sister, A., in the same preschool H. attended. The director noted that KC's speech was delayed and A. did not move around like a child her age should.  In October, KC's teacher and an assistant director saw bruising, inflammation, and scratches on the right side of his eye and ear and reported the injury to child protective services (CPS).  CPS investigated the cause of the injury, but both Balbuena and Morris denied using physical punishment or knowing how he received the injury.

Later that month Morris pointed out to the preschool director that KC had burned his foot.  Morris told the director he did not want her to "think that [he] did it."  According to the director, the foot looked "charred," and since the injury had received no medical attention, she told Morris to take KC to the hospital for treatment.  Again she reported the injury to CPS.  KC had a third-degree burn that penetrated the dermis and destroyed the nerves.  The injury had occurred two days earlier and the surrounding tissue had become infected.  About a week later, KC complained to the preschool's assistant director that his foot hurt.  She removed his shoe and sock and saw the foot was no longer bandaged and was bloody.  Balbuena withdrew the children from the preschool on November 8 because her day care subsidy was terminated.

From November 8 until November 17, KC was in the exclusive care and custody of Balbuena and Morris.  They left three-year-old KC and fifteen-month-old A. alone in the apartment for periods of time while they went to work at a company located a few minutes from their apartment.  They would also take turns coming home

3

and taking care of the children for some of the workday.  Life in the apartment by that time had become exceedingly stressful.

It would be an understatement to say that Balbuena cared more about men and their drugs than she did her children.  Already a methamphetamine user, she became a drug dealer to support her husband Noel's expensive habit.  She slept with her supplier and told him he had fathered her second child.  She stole rents from a property she was managing for her mother because she and Noel could not pay their rent, and when Noel left her and she was evicted from her apartment, she lived with friends, eventually in a car with her children, and then moved to Sacramento.  Nevertheless, she desired a relationship with Morris and was willing to pay for his marijuana and for much more than her share of the housing and food costs, give him massages, do his laundry, and to provide him with access to her car and cell phone.

Yet, according to Balbuena at trial, Morris was always angry.  He did not think that she disciplined her children, and he was particularly annoyed with KC and the lack of progress he was making with toilet training.  She described at great length and in disgusting detail how he physically disciplined KC, including forcing him to eat his own feces.  She explained that for the first time she also started spanking KC to placate Morris and to keep him from inflicting more severe punishment on the child.  She testified she had seen Morris punch KC in the stomach on one occasion.  With respect to KC's burned foot, Morris told her he had run a comb down the bottom of his foot while the skin was soft from a bath and the skin had peeled off.  Morris justified the injury as punishment because KC had not jumped up and down as instructed.  Balbuena also testified that Morris had hit KC on the side of the head, causing the injuries to his ear that had been reported to CPS.

Balbuena's testimony at trial, however, was at odds with a confession she gave three weeks after KC died, during which she claimed sole responsibility for his death.  She confessed that she had been smoking methamphetamine, without Morris's knowledge, which made her feel "numb and stuff."  She described how she became extremely angry after coming home for lunch on November 16 because KC vomited the Skittles she had given him as a reward for finishing his chicken nuggets and she was forced to clean it up.  She claimed she was so angry she hit his head about 20 to 30 times in 30 minutes.  She believed he got a bruise on his leg when she pushed him into the metal railing on his bed, and a black eye when she threw a plastic container of wipes at him.

Balbuena told her interrogator that she probably gave KC the fatal blow later that evening.  According to this version, after work she was exasperated because KC had not taken a nap as planned.  She dragged him out of bed and hit him against the wall.  Enraged

4

because he would not jump up and down in the way she demanded, she started spanking him.  She enlisted Morris's help and he hit KC three times with a metal spatula.  Finally, she made KC stand in the corner, but when he turned around, she pushed his face against the wall and hit him so hard it made a "huge sound" and his head bounced off the wall.

Morris gave a statement after KC was hospitalized but before he died.  He assumed responsibility for KC's condition because he had placed him in the crib and he believed KC had fallen while climbing out of the crib.  He admitted he made KC jump up and down for up to 30 minutes to punish him for various transgressions.  In the late afternoon on November 16, KC fell and hit his eye while doing jumping jacks.  Morris told KC to take a nap when he left to pick up Balbuena from work, but when they returned, KC was still awake, so he made him stand with his arms outstretched for another 30 minutes.  Later that evening, KC vomited.  Morris put him to bed in another room so he and Balbuena could watch a movie.  The following morning, Morris found KC in the bathroom, coughing and wheezing.  He put KC back to bed but not long after got him up again and took him back to the bathroom.  He told KC to stand up straight, but the toddler's knees buckled and he fell to the floor.  Morris said KC appeared to be choking and his breathing was very shallow.  Hysterical, Balbuena called 911, and according to Morris, he tried to administer CPR.  He was afraid he had hurt KC trying to give him CPR.

A defense expert agreed with the pathologist that head trauma was the cause of death and the death appeared to be a homicide.  He opined, however, that the injury to KC's eye could have been caused by a fall, and he had not sustained significant injuries to the abdomen.  Nor did he find the liver had been lacerated.

Morris's sister testified that Balbuena had told her she had once thrown KC across the room.  Another witness testified that Balbuena had told him she had been forced to become involved in the murder of her child.

Dckt. No. 1 at 60-67.  In her own statement of the facts, petitioner states that David Sprong,

Morris's cellmate in the county jail, testified that Morris told him he had killed a boy.  *Id.* at 30.

Petitioner explains that her defense "was that she herself did not inflict KC's injuries and she did

not know that Morris had inflicted the injuries until she saw the video of Sprong's statement."

*Id.* at 36.

////

## II.        Procedural Background

On January 17, 2008, a jury found petitioner guilty of the first degree murder of her three-year old son, in violation of Cal. Penal Code § 187(a); assault on a child under the age of eight by means of force likely to produce great bodily injury, resulting in the death of her three-year old son, in violation of Cal. Penal Code § 273ab; and felony child endangerment of her fifteen month-old daughter, in violation of Cal. Penal Code § 273a(a).  Clerk's Transcript on Appeal (CT) at 932, 934.  Petitioner received a sentence of thirty-one years to life in state prison. *Id.*

Petitioner filed a timely appeal in the California Court of Appeal for the Third Appellate District.  Resp't's Lodg. Doc. 1.  Her judgment of conviction was affirmed in an unpublished opinion dated November 10, 2010.  Resp't's Lodg. Doc. 4.  That opinion was amended on December 9, 2010.  Resp't's Lodg. Doc. 5.

Petitioner subsequently filed a petition for review in the California Supreme Court. Resp't's Lodg. Doc. 6.  That petition was summarily denied on February 23, 2011.  Resp't's Lodg. Doc. 7.

Petitioner commenced this action by filing a petition for writ of habeas corpus in this court on May 3, 2011.

## III.       Analysis

### A.  Standards for a Writ of Habeas Corpus

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or application of state law.  *See Wilson v. Corcoran*, 562 U.S.___, ___, 131 S. Ct. 13, 16 (2010); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Park v. California*, 202 F.3d 1146, 1149 (9th Cir. 2000).

////

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the state court decision. *Stanley v. Cullen*, 633 F.3d 852, 859 (9th Cir. 2011) (*citing Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). Nonetheless, "circuit court precedent may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably." *Stanley*, 633 F.3d at 859 (quoting *Maxwell v. Roe*, 606 F.3d 561, 567 (9th Cir. 2010)).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. *Price v. Vincent*, 538 U.S. 634, 640 (2003). Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.[2] *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Williams*, 529 U.S. at 413; *Chia v. Cambra*, 360 F.3d 997, 1002 (9th Cir. 2004). In this regard, a federal habeas court "may not issue the writ

---

[2] Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding." *Stanley*, 633 F.3d at 859 (quoting *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004)).

1   simply because that court concludes in its independent judgment that the relevant state-court

2   decision applied clearly established federal law erroneously or incorrectly.  Rather, that

3   application must also be unreasonable." *Williams*, 529 U.S. at 412.  *See also Schriro v.*

4   *Landrigan*, 550 U.S. 465, 473 (2007); *Lockyer*, 538 U.S. at 75 (it is "not enough that a federal

5   habeas court, in its independent review of the legal question, is left with a 'firm conviction' that

6   the state court was 'erroneous.'").  "A state court's determination that a claim lacks merit

7   precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness

8   of the state court's decision." *Harrington v. Richter*, 562 U.S.___,___,131 S. Ct. 770, 786

9   (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  Accordingly, "[a]s a

10  condition for obtaining habeas corpus from a federal court, a state prisoner must show that the

11  state court's ruling on the claim being presented in federal court was so lacking in justification

12  that there was an error well understood and comprehended in existing law beyond any possibility

13  for fairminded disagreement." *Harrington*,131 S. Ct. at 786-87.

14       If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing

15  court must conduct a de novo review of a habeas petitioner's claims.  *Delgadillo v. Woodford*,

16  527 F.3d 919, 925 (9th Cir. 2008); *see also Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008)

17  (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of §

18  2254(d)(1) error and that, if there is such error, we must decide the habeas petition by

19  considering de novo the constitutional issues raised.").

20       The court looks to the last reasoned state court decision as the basis for the state court

21  judgment.  *Stanley*, 633 F.3d at 859; *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004).

22  If the last reasoned state court decision adopts or substantially incorporates the reasoning from a

23  previous state court decision, this court may consider both decisions to ascertain the reasoning of

24  the last decision.  *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  "When

25  a federal claim has been presented to a state court and the state court has denied relief, it may be

26  presumed that the state court adjudicated the claim on the merits in the absence of any indication

8

or state-law procedural principles to the contrary." *Harrington*, 131 S. Ct. at 784-85.  This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." *Id*. at 785 (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)).  Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d).  *Stanley*, 633 F.3d at 860; *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).   "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." *Himes*, 336 F.3d at 853. Where no reasoned decision is available, the habeas petitioner still has the burden of "showing there was no reasonable basis for the state court to deny relief." *Harrington*, 131 S. Ct. at 784.

When it is clear, however, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo.  *Stanley*, 633 F.3d at 860; *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006); *Nulph v. Cook,* 333 F.3d 1052, 1056 (9th Cir. 2003).[3]

## B. Petitioner's Claims

### 1. Jury Instruction Error

Petitioner raises three claims of jury instruction error.  After setting forth the applicable legal principles, the court will address these claims in turn below.

#### a. Legal Standards

In general, a challenge to jury instructions does not state a federal constitutional claim. *Engle v. Isaac*, 456 U.S. 107, 119 (1982)); *Gutierrez v. Griggs*, 695 F.2d 1195, 1197 (9th Cir. 1983).  In order to warrant federal habeas relief, a challenged jury instruction "cannot be merely

---

[3] The United States Supreme Court has recently granted certiorari in a case apparently to consider this issue.  *See Williams v. Cavazos*, 646 F.3d 626, 639-41 (9th Cir. 2011), *cert. granted in part*, ___U.S.___, 132 S. Ct. 1088 (2012).

'undesirable, erroneous, or even "universally condemned,"' but must violate some due process right guaranteed by the fourteenth amendment." *Cupp v. Naughten*, 414 U.S. 141, 146 (1973). To prevail on such a claim petitioner must demonstrate "that an erroneous instruction 'so infected the entire trial that the resulting conviction violates due process.'" *Prantil v. State of Cal.*, 843 F.2d 314, 317 (9th Cir. 1988) (quoting *Darnell v. Swinney*, 823 F.2d 299, 301 (9th Cir. 1987)). In making its determination, this court must evaluate the challenged jury instructions "'in the context of the overall charge to the jury as a component of the entire trial process.'" *Id.* (quoting *Bashor v. Risley*, 730 F.2d 1228, 1239 (9th Cir. 1984)). Where the challenge is to a refusal or failure to give an instruction, the petitioner's burden is "especially heavy," because "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Henderson*, 431 U.S. at 155. *See also Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997).

### b. Petitioner's Claims

In her first ground for relief, petitioner claims that the instruction given to her jury on the natural and probable consequences doctrine improperly permitted the jury to convict her of first degree murder without a finding that first degree murder was a natural and probable consequence of the "target crime." Dckt. No. 1 at 37. In her second ground for relief, petitioner claims that the jury instruction informing the jury that the offenses of murder and child assault are not complete until the victim's death, and that conduct committed after the fatal blow may constitute aiding and abetting, allowed the jury to convict her on an invalid legal theory. *Id.* at 41. In her third ground for relief, petitioner claims that the jury instruction on the natural and probable consequences doctrine erroneously permitted the jury to base her conviction on findings that (1) the non-target offenses were a natural and probable consequence of felony child abuse, and that (2) petitioner aided and abetted infliction of physical punishment on a child but did not aid and abet felony child abuse. *Id.* at 49.

////

### c. State Court Decision

The California Court of Appeal analyzed all of these claims together, reasoning as follows:

> Review of Balbuena's claims of instructional errors, particularly the three involving liability for the natural and probable consequences of aiding and abetting target offenses, is complicated because two defendants were tried before separate juries, each on three theories of liability for murder in the first degree, and yet we cannot decipher from the separate verdicts who was the perpetrator and who was the aider and abettor and, if Balbuena was the aider and abettor, on what theory of liability she was found guilty.  Such a complicated factual and legal setting is ripe for esoteric legal musings and speculation about how the jurors might have contorted simple English into illogical puzzles with unlawful solutions.  But we remain loyal to well-settled principles that it is incumbent upon a criminal defendant to request special instructions or clarification of existing instructions in the absence of a trial court's sua sponte obligation to instruct on general principles of law or lesser included offenses (*People v. Saille* (1991) 54 Cal.3d 1103, 1120, 2 Cal.Rptr.2d 364, 820 P.2d 588), and that it is incumbent upon us to read jury instructions not as someone doing a crossword puzzle would, but as a reasonable lay juror would (*Estelle v. McGuire* (1991) 502 U.S. 62, 72 [116 L.Ed.2d 385] ).  With these principles in mind, we conclude there was no instructional error.
>
> **A. Natural and Probable Consequences of Aiding and Abetting**
>
> Balbuena challenges three instructions, each of them involving some aspect of the natural and probable consequences doctrine. We cannot review fragments of instructions divorced from the entire instruction; nor can we review an instruction isolated from the complete charge to the jury.  (*People v. Thomas* (2007) 156 Cal.App.4th 304, 310, 67 Cal.Rptr.3d 272.)  Thus, before we can address Balbuena's specific challenges, we must provide an overview of the murder instructions the jury heard.
>
> As to first degree murder, the jury was instructed on torture murder.  The court stated, "A defendant is guilty of first degree murder if the People have proved that the defendant murdered by torture.  The defendant murdered by torture if:
>
> "One, he or she willfully, deliberately and with premeditation intended to inflict extreme and prolonged pain on the person killed while that person was still alive.

////

"Two, he or she intended to inflict such pain on the person killed for the calculated purpose of revenge[,] persuasion, or any other sadistic reason.

"Three, the acts causing death involved [a] high degree of probability of death.  And,

"Four, the torture was a cause of death."

The court further instructed the jury, "A finding of torture does not require that the defendant intended to kill."

Any other murder, the jury learned, was murder of the second degree.  The jury was directed to decide whether the murder was of the first or second degree.

Balbuena could be found guilty of murder if the jury found she was either a perpetrator or an aider and abettor.  The court explained the basic principles of aiding and abetting.  "To pro[ve] that a defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that:
One, the perpetrator committed the crime.

"Two, the defendant knew that the perpetrator intended to commit the crime.

"Three, before or during the commission of the crime the defendant intended to aid and abet the perpetrator in committing the crime.  And

"Four, the defendant's words or conduct did, in fact, aid and abet the perpetrator's commission of the crime."

Balbuena expressly requested an instruction on accessories after a felony.  The court read the standard instruction, including the last paragraph, requested by the prosecution.

"In contrast to an aider and abettor, an accessory after a felony is defined as follows:

"One, another person, ... whom I will call the perpetrator, committed a felony.

"Two, the defendant knew that the perpetrator had committed a felony or that the perpetrator had been charged with or convicted of a felony.

"Three, after the felony had been committed the defendant either harbored, concealed or aided the perpetrator.  And

////

12

"Four, when the defendant acted, he or she intended that the perpetrator avoid arrest, trial, or punishment.

"For the crimes of murder and assault on a child resulting in death, however [,] the crimes are not complete until the victim dies.  For these crimes, depending upon what you determine the facts to be, conduct occurring after the injuries have been inflicted, but before the victim dies, may constitute aiding and abetting.  However, conduct occurring after the victim dies does not constitute aiding and abetting, although it may make one an accessory after a felony."

Traditionally, the doctrine of natural and probable consequences holds aiders and abettors vicariously liable for an expansive array of crimes the perpetrators actually commit.  The doctrine provides juicy fodder for appellants anxious to distance themselves from the errant conduct of their cohorts in crime.  Balbuena challenges the following instruction in relevant part:

"Before you may decide whether the defendant is guilty of murder or assault on a child resulting in death under [the natural and probable consequences] theory, you must first decide whether he or she is guilty of inflicting physical punishment on a child or felony child abuse.

"To prove that the defendant is guilty of murder, or the lesser offense of involuntary manslaughter or assault on a child resulting in death under this theory, the People must prove beyond a reasonable doubt that,

"One, the crime of inflicting physical punishment on a child in violation of Penal Code Section 273d(a) or felony child abuse in violation of Penal Code Section 273a(a) was committed.

"Two, the defendant aided and abetted that crime.

"Three, a coparticipant during the commission of that target crime of inflicting physical punishment on a child, Penal Code 273d(a), or felony child abuse, Penal Code Section 273a[([a])], committed the charged crime of murder or the lesser crime of involuntary manslaughter, or assault on a child resulting in death.  And

"Four, the commission of the crime of murder or the lesser offense of involuntary manslaughter or assault on a child resulting in death was a natural and probable consequence of the commission of the infliction of physical punishment on a child, or felony child abuse.

[¶] ... [¶]

////

13

"The People are alleging that the defendant originally intended to aid and abet either inflicting physical punishment on a child, or felony child abuse.

"The defendant is guilty of murder or the lesser offense of involuntary manslaughter [or] assault on a child resulting in death if you decide that the defendant aided and abetted one of these crimes, and that murder or the lesser offense of involuntary manslaughter or assault on a child resulting in death was the natural and probable result of one of these crimes.  However, you do not need to agree about which of these two crimes the defendant aided and abetted."

**1. Torture Murder.**  As described above, the jury was instructed that to find Balbuena guilty of murder as an aider and abettor, murder must have been a natural and probable consequence of Morris's commission of the target offense – either the infliction of physical punishment on a child or felony child abuse.  Balbuena insists that in light of two opinions from our court, *People v. Woods* (1992) 8 Cal.App.4th 1570, 11 Cal.Rptr.2d 231 (*Woods*) and *People v. Hart* (2009) 176 Cal.App.4th 662, 97 Cal.Rptr.3d 827 (*Hart*), the trial court had a sua sponte obligation to instruct the jury not just that murder was a natural and probable consequence, but that murder by torture was.  In Balbuena's view, the failure to instruct on the specific theory of murder or, in other words, the greater offense, constitutes reversible error.  We disagree.  Neither *Woods* nor *Hart* imposes a sua sponte obligation on the trial court to tailor the natural and probable consequences instruction to the nuances of the specific methodology used by the perpetrator.

"A trial court has a duty to instruct on general principles of law that are 'closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case.' [Citation.]"  (*People v. Moye* (2009) 47 Cal.4th 537, 554, 98 Cal.Rptr.3d 113, 213 P.3d 652 .)  A defendant is entitled to a pinpoint instruction only upon request when there is evidence supportive of the defendant's theory, "'but they are not required to be given sua sponte.' [Citations.]"  (*People v. Gutierrez* (2009) 45 Cal.4th 789, 824, 89 Cal.Rptr.3d 225, 200 P.3d 847 .)  We turn then to our own jurisprudence to determine whether, as Balbuena suggests, *Woods* and *Hart* impose a sua sponte duty upon the trial court to signal to the jurors that they must determine whether torture murder was a reasonably foreseeable consequence of the commission of either the infliction of physical punishment on a child or felony child abuse.

*Woods* is an important case in the evolution of the law regarding the liability of aiders and abettors for the natural and probable consequences of the commission of target offenses.  In *Woods*, we held that an aider and abettor may be guilty of a lesser crime or a

14

lesser degree of a crime than the offense committed by the perpetrator.  (*Woods, supra*, 8 Cal.App.4th at pp. 1586-1587, 11 Cal.Rptr.2d 231.)  "[T]he aider and abettor and the perpetrator may have differing degrees of guilt based on the same conduct depending on which of the perpetrator's criminal acts were reasonably foreseeable under the circumstances and which were not."  (*Ibid.*, italics omitted.)  Accordingly, "[i]f the evidence raises a question whether the offense charged against the aider and abettor is a reasonably foreseeable consequence of the criminal act originally aided and abetted but would support a finding that a necessarily included offense committed by the perpetrator was such a consequence, the trial court has a duty to instruct sua sponte on the necessarily included offense as part of the jury instructions on aider and abettor liability."  (*Id.* at p. 1593, 11 Cal.Rptr.2d 231.)

But *Woods* is of no help to Balbuena.  *Woods* is rooted in the unremarkable principle that a jury must be instructed on lesser included offenses.  We reflected: "In effect, the jury was given an unwarranted all-or-nothing choice with respect to aider and abettor liability for the killing . . . .  Faced with evidence from which it could conclude that only second degree murder was a reasonably foreseeable consequence of Windham's aiding and abetting Woods in assaulting Allen and Johnson, but having no option to convict Windham of second degree murder, the jury may have been reluctant to acquit him of the greater offense of first degree murder.  Stated another way, the jury may have returned a verdict of guilt on first degree murder to avoid the absurd result of absolving Windham of any responsibility for a killing which was a reasonably foreseeable consequence of his act of aiding and abetting the violent assaults on Allen and Johnson.  This illustrates why the jury should have been told it could find a defendant guilty of second degree murder as an aider and abettor even if it determined the perpetrator was guilty of first degree murder."  (*Woods, supra*, 8 Cal.App.4th at p. 1590, 11 Cal.Rptr.2d 231.)

Here, by contrast, the jury was instructed on the lesser included offenses of second degree murder as well as involuntary manslaughter.  Thus, the infirmity we found in *Woods*, that an aider and abettor's liability was not inexorably linked to the greater crimes the perpetrator committed rather than the foreseeability of lesser included offenses, was not at issue.

*Hart*, however, does contain more fertile ground.  The two defendants in *Hart* attempted to rob a liquor store.  (*Hart, supra*, 176 Cal.App.4th at p. 666, 97 Cal.Rptr.3d 827.)  When defendant Hart, who was armed, saw the clerk open a drawer containing a gun, he shot at the clerk three times, hitting him once in the abdomen.  Miraculously, the victim survived.  (*Ibid.*)  Defendant Rayford, the accomplice, together with Hart, the perpetrator, were charged with attempted murder.  (*Ibid.*)

On appeal, Rayford complained that "[t]he court did not relate the instruction concerning premeditation and deliberation to the natural and probable consequences instruction.  In other words, the court did not instruct the jury that, in order to find Rayford guilty of attempted premeditated murder as an aider and abettor under the natural and probable consequences doctrine, the jury would have to find that attempted premeditated murder is a natural and probable consequence of the attempted robbery.  With respect to the natural and probable consequences doctrine, the jury was asked only whether 'under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of the attempted murder or assault with a firearm was a natural and probable consequence of the commission of the attempted robbery." (*Hart, supra*, 176 Cal.App.4th at p. 670, 97 Cal.Rptr.3d 827.)

The opinion, rooted as it is to the logic of *Woods*, rests on the distinction between greater and lesser included offenses and the court's obligation to instruct on the panoply of options to convict on lesser included offenses.  In evaluating the sufficiency of the instructions, we began with the pivotal observation that "[a]ttempted premeditated murder is the functional equivalent of a greater offense than attempted unpremeditated murder." (*Hart, supra*, 176 Cal.App.4th at p. 672, 97 Cal.Rptr.3d 827.)  We concluded that the trial court erred by failing to instruct the jury, sua sponte, that "it must determine whether premeditation and deliberation, as it relates to attempted murder, was a natural and probable consequence of the target crime." (*Id.* at p. 673, 97 Cal.Rptr.3d 827.)

Balbuena's jury, as pointed out above, was instructed on the lesser included offense of second degree murder.  But she maintains the court had a sua sponte obligation to go further; indeed, she would have us impose a sua sponte obligation on the court to clarify for the jury any ambiguity in the use of the word "murder" with a pinpoint instruction stating that the kind of murder, that is, torture murder, was a reasonably foreseeable consequence of the commission of the target offenses.  We conclude that such a duty is not encompassed by the court's sua sponte obligations to instruct on the general principles of law and lesser included offenses.

Balbuena hypothesizes that the jury might have found that second degree murder was reasonably foreseeable, whereas torture murder was not.  The jury clearly had that option since it was instructed on both first and second degree murder as well as involuntary manslaughter.  The problem here is not in the court's failure to instruct in a manner that would allow the jury to convict on a lesser included offense, but on the failure to pinpoint that "torture murder," not just "murder," needed to be reasonably foreseeable.  Thus, the failure was not to instruct on general principles of law closely and openly connected to the facts of the case or on lesser

1    included offenses, but to clarify a potential ambiguity for the
     benefit of Balbuena.

2
     Because the recent evolution of the law has begun to disentangle
3    an aider and abettor's liability from that of the perpetrator (*People
     v. McCoy* (2001) 25 Cal.4th 1111, 108 Cal.Rptr.2d 188, 24 P.3d
4    1210; *Woods, supra*, 8 Cal.App.4th 1570, 11 Cal.Rptr.2d 231),
     Balbuena could have requested the instruction she now faults the
5    trial court for failing to initiate.[4]  Indeed, Hart suggests that such
     an instruction is advisable.  But we conclude the trial court did not
6    err by failing to instruct, sua sponte, that the jury had to
     specifically find that the mechanism of death, i.e., torture, was
7    foreseeable. This is the type of fine distinction a defendant must
     request a court to clarify; our trial courts need not explain that the
8    particular type of murder must be foreseeable under the natural and
     probable consequences doctrine.  We find no instructional error on
9    this ground.

10   **2. Accessory After the Felony.**  Now we turn to make-believe
     puzzles.  Balbuena posits a most unlikely and convoluted
11   construction of an instruction she initially requested.  She eschews
     the fundamental principle urged by the Attorney General that
12   "[w]hen a claim is made that instructions are deficient, we must
     determine whether their meaning was objectionable as
13   communicated to the jury . . . .  The meaning of instructions is no
     longer determined under a strict test of whether a 'reasonable
14   juror' could have understood the charge as the defendant asserts,
     but rather under the more tolerant test of whether there is a
15   'reasonable likelihood' that the jury misconstrued or misapplied
     the law in light of the instructions given, the entire record of trial,
16   and the arguments of counsel."  (*People v. Dieguez* (2001) 89
     Cal.App.4th 266, 276-277, 107 Cal.Rptr.2d 160 (*Dieguez*).)
17   Balbuena insists the instructions were not ambiguous; they were
     simply wrong. Since they are legally wrong, she concludes, we
18   need not review the instructions from the vantage point of the
     hypothetically reasonable juror.  She is mistaken.

19
     As reported above, the jury was instructed on the elements of an
20   accessory after the commission of a felony.  At the prosecutor's

21   _____

22        [4]  The jury was instructed, under CALCRIM No. 400, that "[a] person is equally guilty of
     the crime whether he or she committed it personally or aided and abetted the perpetrator who
23   committed it."  The "equally guilty" language addresses the basic, introductory concept of
     principal liability and has been held to be a correct statement of the law generally.  (*People v.
     Samaniego* (2009) 172 Cal.App.4th 1148, 1165, 91 Cal.Rptr.3d 874.)  Although it can be
24   misleading (*People v. Nero* (2010) 181 Cal.App.4th 504, 507, 104 Cal.Rptr.3d 616), we disagree
     with defendant that it misstates the law, particularly when read in the context of all the
25   instructions given the jury.  In the absence of a request by defendant to modify the instruction or
     an objection at trial, the court did not have a sua sponte obligation to eliminate or redraft
26   CALCRIM No. 400.

                                                17

request, the court also explained that because a murder is not complete until the victim dies, acts that assist the perpetrator after the fatal blows but before death may constitute aiding and abetting. She argues the instruction "did not confine liability for acts committed after the fatal blows were struck but before the victim died to a simple murder theory, but instead permitted the jury to convict [Balbuena] of the charged offenses of murder and child assault resulting in death under a natural and probable consequence theory even if a juror believed that [Balbuena] aided and abetted Morris in the commission of an enumerated target crimes [sic] by lying for him after the fatal blows were struck."

We are unfamiliar with the concept of "a simple murder theory." We assume Balbuena has selected this terminology to distinguish murder committed by the perpetrator from liability arising as an aider and abettor under the natural and probable consequences doctrine.  As this case amply demonstrates, references to murder can be ambiguous because murder encompasses a wide range of mental states with varying degrees of culpability.  We need not add to the confusion with an inappropriate new designation of "simple murder," nor can we accept the notion that any murder is simple or that using "simple murder" as some kind of new designation conveys either an accurate or helpful elucidation of the complexities of the crime.

Leaving "simple murder" aside, we do not believe that jurors, let alone reasonable jurors, would make the illogical leaps Balbuena proposes in applying the instruction to the facts of this case.  First, Balbuena would have us assume that the jurors found she had not aided and abetted Morris before he struck the fatal blows to the child's head and stomach.  Given the abundance of evidence to the contrary, including her knowledge of her son's burned foot, her awareness of Morris's violent propensities toward the boy, her communication with him about making the child jump for inordinate periods of time, and her observation of the child's distressed condition, it strains credulity the jurors would conclude Balbuena aided and abetted Morris only after the fatal blows had been administered.

But even if we assume the jurors might have made such a factual finding, the solution to the puzzles she offers defies the facts with respect to causation.  Under this scenario we begin with the fatal blows.  Balbuena would have us believe the jurors found that she aided and abetted Morris by lying on his behalf.  But she argues that the vice is in the application of the natural and probable consequences doctrine.  We must, therefore, suppose that by lying for Morris after the fatal blows, she aided and abetted one or both of the target offenses.  To aid or abet one of those offenses Morris must have further abused KC.  But the natural and probable consequence of the further abuse would not have been murder since under this outlandish hypothetical he had already

administered the fatal blows.  In other words, the natural and probable consequences of abuse that occurred after the delivery of the fatal blows would not have resulted in murder.  And most significantly, reasonable jurors would not engage in such convoluted reasoning.

Moreover, we reject Balbuena's assertion that the instruction was wrong.  The concept that a murder is not complete until the victim dies was taken from *People v. Celis* (2006) 141 Cal.App.4th 466, 46 Cal.Rptr.3d 139 (*Celis*).  In *Celis*, the defendant wanted an instruction that murder was complete when the final blow was struck so that the assistance she gave the perpetrator thereafter would make her an accessory after a felony rather than an aider and abettor.  (*Id.* at p. 471, 46 Cal.Rptr.3d 139.)  The court found there was no sua sponte obligation to instruct because the murder was not complete when the final blow was struck, but only when the victim died. ( Ibid.)

There is, most notably, no mention of natural and probable consequences in *Celis*.  It is not the *Celis* principle that murder is complete when the victim dies that is problematic for Balbuena, but the application of the natural and probable consequences doctrine to that pivotal time period between the fatal blows and death.  We conclude that each of the instructions was faithful to the principles of law on accessories after the fact and the natural and probable consequences doctrine, and it is only Balbuena's unnatural and improbable importation of the natural and probable consequences doctrine into the time period between the fatal blows and death that leads to the absurd theoretical misapplication she now suggests on appeal.  There is no "reasonable likelihood" that the jury actually considered such an abstract possibility, far removed from the facts of the case, the complete charge to the jury, and the entire record, and in so doing misconstrued or misapplied the law.  We reject Balbuena's argument to the contrary.

**3.  Target Offenses.**  Balbuena's final challenge to the instructions on the natural and probable consequences doctrine is equally disingenuous.  This time, she asks us to assume the jurors disregarded common sense and the plain meaning of the words "one of these crimes" for another complicated puzzle.  Again, there is no reasonable likelihood the jury misconstrued or misapplied the law.  (*Dieguez, supra*, 89 Cal.App.4th at pp. 276-277, 107 Cal.Rptr.2d 160.)

The court gave a thorough instruction on the natural and probable consequences doctrine we repeated in relevant part at the outset of the discussion on instructional error.  The last paragraph uses the phrase "one of these crimes" twice.  It reads: "The defendant is guilty of murder or the lesser offense of involuntary manslaughter [or] assault on a child resulting in death if you decide that the

defendant aided and abetted *one of these crimes*, and that murder or the lesser offense of involuntary manslaughter or assault on a child resulting in death was the natural and probable result of *one of these crimes*.  However, you do not need to agree about which of these two crimes the defendant aided and abetted."  (Italics added.)

Balbuena argues that the italicized language allowed the jury to find that she aided and abetted one of the target crimes but was found guilty of murder because the other target offense was the natural and probable consequence of the target offense she had not aided and abetted.  We agree with the Attorney General that the phrase "one of these crimes" is not reasonably susceptible to Balbuena's interpretation.  The use of parallel phrasing conveyed that liability under the natural and probable consequences doctrine required a finding that Balbuena aided and abetted the same target offense that foreseeably resulted in the charged offense.  In other words, the use of "one of these crimes" twice in the same sentence would have been understood by a juror to refer to the same crime.  It would defy common sense for a juror to conclude that the murder and the assault on a child resulting in death would have to be the natural and probable consequence of the crime she did not aid and abet rather than the target offense she did aid.  As a result, there was no error.

Dckt. No. 15 at 80-96.

### d.  Analysis

For the reasons expressed in the very thorough decision of the California Court of Appeal, petitioner has failed to demonstrate that the instructions given to her jury on the natural and probable consequences doctrine and aiding and abetting liability rendered her trial fundamentally unfair or otherwise violated her right to due process.  The state court decision on petitioner's jury instruction claims is not objectively unreasonable, nor is it "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Harrington*, 131 S. Ct. at 786-87.  Accordingly, petitioner is not entitled to relief on these claims.

### 2.  Ineffective Assistance of Counsel

In her final claim, petitioner argues that her trial counsel rendered ineffective assistance in failing to utilize an expert witness to testify that she was the victim of battering by Morris.

20

Dckt. No. 1 at 53.  The California Court of Appeal issued the last reasoned decision on this claim.  The court ruled as follows:

> Relying on the expert opinions of a marriage and family counselor who finds that 98 percent of the women she interviews are victims of IPB and of a lawyer who testified he hires a mental health expert in every case involving a homicide, and despite the fact she had not told her trial lawyer most of the facts she purportedly disclosed only after her conviction, Balbuena contends her trial lawyer was incompetent because he did not retain an expert on IPB.  The thin, albeit anorexic, legal and factual basis upon which her IPB claim rests does not render counsel's informed tactical choice unreasonable or incompetent.
>
> There is no dispute that Balbuena is guaranteed the effective assistance of counsel by the federal and state Constitutions.  (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; *Strickland v. Washington* (1984) 466 U.S. 668, 688-689 [80 L.Ed.2d 674] (*Strickland*); *In re Fields* (1990) 51 Cal.3d 1063, 1069, 275 Cal.Rptr. 384, 800 P.2d 862.)  But she bears a heavy burden to prove that her lawyer's ""'representation fell below an objective standard of reasonableness . . . under prevailing professional norms ...' [citation]"'"  (*People v. Weaver* (2001) 26 Cal.4th 876, 925, 111 Cal.Rptr.2d 2, 29 P.3d 103) and that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  (*Strickland*, at p. 694.)
>
> As Balbuena recognizes, we must accord great deference to the tactical decisions of trial counsel to avoid "second-guessing counsel's tactics and chilling vigorous advocacy by tempting counsel 'to defend himself against a claim of ineffective assistance after trial rather than to defend his client against criminal charges at trial . . . .' [Citation.]"  (*In re Cordero* (1988) 46 Cal.3d 161, 180, 249 Cal.Rptr. 342, 756 P.2d 1370.)  Her ineffectiveness claim must be rejected if her lawyer's decisions, as viewed from his perspective at the time, were within the range of reasonably competent representation.  (*People v. Freeman* (1994) 8 Cal.4th 450, 498, 34 Cal.Rptr.2d 558, 882 P.2d 249, *superseded by statute on other grounds* in *Covarrubias v. Superior Court* (1998) 60 Cal.App.4th 1168, 1174, 71 Cal.Rptr.2d 91.)
>
> **Trial Counsel's Declaration**
>
> Since the pivotal question in evaluating Balbuena's ineffectiveness claim is whether counsel made reasonable tactical choices based on the information he had at the time, we begin with an examination of what he knew and why he decided to forego an IPB defense.  He provided the trial court with a 17-page declaration in response to Balbuena's motion for a new trial based on

ineffectiveness of counsel.

Counsel, an experienced criminal defense attorney, was well acquainted with the concept of IPB, having attended multiple continuing education programs on the subject.  Nevertheless, he plainly explains, "I did not present the testimony of an expert on the notion of IPB in the present case because there was no factual basis to support such testimony in my opinion."

Counsel met with Balbuena numerous times in the county jail.  He asked her directly "whether she had ever been struck, hit, beaten or abused by James Morris to the extent that it may have interfered with or overcome her ability to make her own independent decisions about the care of her children."  After several interviews, he insisted that she stop lying and tell him only the truth. Balbuena took an oath to tell the truth and proceeded to describe the ghastly details of how Morris abused three-year-old KC by forcing him to eat his feces; cutting the bottom of his foot with a comb; hitting him, lifting him off the ground by his head, and pushing or slamming him into a wall; striking him in the groin and testicles; and spanking him.

When asked why she, a mother, would stay with a man abusing her child, Balbuena offered four reasons: "(1) she was stupid, (2) she loved Jim, (3) Jim always apologized, crying and saying he was sorry, and (4) things seemed to get better because Jim switched to requiring that KC jump or stand in place."  Counsel pointed out, "During our discussion of those reasons, she never said that Jim threatened or coerced her to falsely report how KC had suffered injury."  Nor in her voluminous journals did she complain about physical and verbal abuse or that Morris had tried to control her.

From the lawyer's perspective, Balbuena was neither subservient nor isolated. She loved and trusted Morris.  In fact, she told Morris she was pregnant when they first met and solicited his advice about getting an abortion because she trusted him.  But she candidly acknowledged that she wanted the relationship much more than Morris did.  She communicated regularly with Morris's sister, and while Morris was sharing the apartment, she began another relationship with a colleague at work.  She minimized her contact with other friends, she told her lawyer, because when she got involved with another man her interest in her friends diminished. She did not say Morris cut her off from her friends or otherwise isolated her.

Balbuena did mention to her lawyer that Morris had slapped her once; he did not recall whether she ever mentioned that Morris had accidentally burned her with a cigarette.  But the lawyer denied she had told him about any of the other acts of abuse outlined in the psychologist's report.  Indeed, the lawyer provided information at

odds with the psychologist's conclusions.  Whereas the psychologist believed Morris had convinced Balbuena that what she was doing was correct, the lawyer observed: "[Balbuena] did not simply suspect that [Morris] was abusing KC, she knew he was.  She told me she knew he was.  She told the jury she knew he was.  And once she became aware of those major assaults, she did not tell me and did not tell the jury that [Morris] 'convinced her what he was doing was correct.' . . . [¶] . . . Nor is it accurate to say that [Balbuena's] ability to perceive the abuse or danger to KC was compromised.  She told the jury the details of [Morris's] major assaults of KC.  She was fully aware of what he had done.  She included herself in their joint efforts to lie about what caused the injuries and in their joint efforts to minimize the damage . . ."

The lawyer had concluded that Balbuena was "emotionally off balance," but he did not believe Morris was the source of her instability.  Even her "false" confession was the result of her decision to help him rather than his coercion of her.  Balbuena agreed with the lawyer's assessment that an expert on false confessions would be counterproductive because she confessed out of love and she never said it "was the product of anything that could reasonably be characterized as abuse by . . . Morris."

**Balbuena's Confession**

On December 7, 2005, Balbuena gave a chilling account of how she abused her son and why.  Because her confession provided crucial information her lawyer needed to strategize her defense, we must embellish on the skeletal outline provided above.

Balbuena had buried her son the weekend before the interview.  Morris and his family provided emotional support for her, whereas her own family did not.  She professed her love for Morris, while acknowledging that he did not love her.  She resented her children because she believed they presented an obstacle to her relationship with Morris.

About a month before KC's death, Balbuena had taken a second job at Target, working nights and weekends.  She began using methamphetamine again to stay awake.  The week before KC's death, she and Morris had been arguing a lot and she would take it out on the children.  She tried to make Morris "guilty or something" by telling him she was seeing other people.  When smoking her methamphetamine, she would ignore the children and stay in the bathroom.

On November 16, Balbuena went home frequently to smoke methamphetamine.  Around 11:00 a.m. she brought KC a McDonald's double cheeseburger and fries, but discovered he had not eaten the chicken nuggets she had given him earlier.  To get him to eat the chicken nuggets, she bribed him with Skittles candy

23

and then proceeded to smoke a bowl of methamphetamine before she returned to the office.  Morris went to the apartment for lunch and got back to work at 1:30.

Balbuena returned about 2:00 p.m. and became angry when she noticed KC had vomited and she had to clean it up.  She hit him on the side or back of the head 20 to 30 times and pushed him into the metal bed railing.  She hit him in the face with a container of wipes.  Then she told him to take a nap, smoked some more methamphetamine, and left for work again.  Morris went home for the day around 4:00.

Before Balbuena returned home that evening, Morris called her to report that KC was not sleeping and they agreed he should jump up and down as punishment.  Shortly thereafter, Morris called again to say that KC had fallen.

KC had a black eye when Balbuena arrived back at the apartment.  He was unusually defiant, behaving like a "little devil kid."  She refused to take him Christmas shopping as promised, called him a "fucking brat," sent him to bed, and started playing cards with Morris.

But KC did not fall asleep.  Balbuena dragged him out of the bed and in doing so hit him up against a wall.  She pulled him by the arm into the kitchen and made him jump up and down.  When he did not jump high enough, she threw him on the floor and spanked him.  Angry because the spanking did not seem to be having any effect, she solicited Morris's help.  Morris struck the child with a metal spatula.

Balbuena decided KC should have to stand in the corner in the kitchen so he would be unable to watch them play cards.  She instructed him to look at the wall, but when he kept looking back, she hit him "pretty hard" and his head bounced off the wall, making a "huge sound."  She knew she had hit him too hard and believed the blow could have caused his death.  He began "bawling like crazy" but faced the wall, where he remained for another hour or two.

Eventually Morris put KC in his daughter's crib so he and Balbuena could watch a movie in her room.  But KC was awake at 1:00 a.m. when Morris checked on him and at 4:00 a.m. when Balbuena checked on him.  When they awoke, KC was vomiting in the bathroom.  Morris kept asking how KC had gotten out of his crib, and Balbuena told him he must have fallen while climbing out.  KC collapsed and they called 911.

////

////

**Discovery**

Balbuena catalogues excerpts from her journals; remarks by neighbors, family members, and friends; e-mails; and statements Morris made to a cellmate as evidence that her lawyer knew Morris had physically and verbally abused her and that knowledge triggered his duty to consult with an IPB expert.  Conspicuously missing from Balbuena's litany of isolated and misleading statements is the context in which they were made and the even

larger context of the length and type of relationship between Balbuena and Morris.  There are many inescapable facts.

First, Balbuena and Morris were roommates, not romantic lovers. Both were single parents with financial difficulties.  As coworkers they decided to minimize their expenses by sharing an apartment. Morris and his daughter H. moved into the apartment on August 1, 2005, only three and one-half months before KC's death.  Their arrangement was financially and logistically expedient, but it was not predicated on mutual love and devotion.

There is no dispute that Balbuena loved Morris and desperately sought his love and affection, but he made it abundantly clear to her that her love would not be reciprocated.  Nevertheless, she pursued him relentlessly.  She simply could not accept the fact that Morris was willing to have sex with her, allow her to pay a disproportionate amount of the living expenses, use her phone and car, and yet reject her romantic advances.

Second, Balbuena leaves out her history of drug abuse.  She had used and sold methamphetamine while married to KC's father, had slept with her dealer, and had confessed that she began using methamphetamine again the month preceding KC's death. Balbuena's lawyer knew that his client was not only hopelessly in love with her codefendant, but that her drug abuse might also explain her distorted perspective, her agitated state, and the desperate lengths she would go to win his affection.  In other words, there were reasons other than IPB to explain why a mother would abuse her son by either personally inflicting death-producing blows and/or allowing a man she coveted to strike him, cut him, and make him eat his feces.

Third, Balbuena was not the "stupid saint" she believed she was. At sentencing, the court stated bluntly that Balbuena was neither stupid nor a saint.  The record supports the court's assessment. While her journal entries record the musings of a troubled soul, they reveal the author to be both intelligent and articulate.  Bright as she is, her abuse and neglect of her own children can hardly be described as saintly.  In short, the lawyer could have reasonably concluded that she was not the helpless, self-sacrificing victim the Monday morning psychologist presented her to be.

Fourth, there is no question that Morris had deep-seated character flaws recognized by everyone in this case.  It is true his stepmother encouraged Balbuena to take care of herself and her children, to recognize her self-worth, and to stop enabling Morris by continuing to support him and allowing him to mistreat her children.  Staff at the preschool, neighbors, and friends all recounted instances when Morris either threatened or mistreated her children.

But there is scant evidence that his frustration with the children resulted in his physically abusing Balbuena.  She insists that one slap alone triggered her lawyer's obligation to hire a mental health professional.  In many, if not most, cases it certainly might be advisable to seek expert guidance on thorny mental health issues involving domestic violence.  But we cannot say that any one fact, taken out of context, makes a lawyer's tactical assessment unreasonable as a matter of law.  Here, the lawyer could have reasonably concluded that two roommates who were living in an extraordinarily stressful, volatile, situation with three very young children, inadequate resources, and no child care might snap and react inappropriately on one occasion.  Indeed, there are no facts surrounding the purported "slap" to explain how and when it occurred.  Without more, we are unwilling to ascribe incompetence to a lawyer for deciding that, in the context of this dysfunctional relationship, Balbuena's casual reference to a slap did not single-handedly make Morris a monster and require the involvement of an IPB expert.

Although the many other examples Balbuena provides solidify the notion that Morris abused the children and was rude and disrespectful toward her, they do not prove that he physically abused her.  And measuring emotional abuse is much more subjective.  To say that Morris was not very nice or that he was unkind in the manner in which he both took advantage of Balbuena and rejected her is far from concluding that he was verbally abusive. We need not consider that slippery slope or decide whether he stepped over the line here because we conclude that Balbuena's lawyer had the professional discretion to make that tactical determination.  He, not we, interviewed his client on many occasions and, well acquainted with the symptoms and psychology of IPB, was better suited to assess whether the evidence before him gave rise to a potentially viable defense.

**Additional Evidence Presented at the Motion for a New Trial**

Balbuena offered the expert opinion of a family and marriage counselor and an attorney, as well as her own declaration, to support her motion for a new trial based on her lawyer's failure to hire an IPB expert.  The experts both testified at the new trial hearing.  Yet the court denied the motion, explaining, in part:

26

"I do feel I am in a pretty good position to make this assessment. This case is very vivid for the Court, and it was lengthy, and it was drawn out over several months with pretrial, trial and post trial. So, I feel I've had an ample opportunity to observe Mr. Foster in his dealings with the court and with his client. [¶] ... [¶] ... [T]he 17 page declaration Mr. Foster filed is, was very also [sic] helpful to the court. I find that his choice not to consult with a mental health expert was not a product of a lack of knowledge, lack of training, or laziness, but it was a rational decision made by a very experienced attorney.... [¶] ... [¶] ... Mr. Foster has been a vigorous advocate throughout these proceedings, pretrial, during the trial and post trial. He was always prepared, he was thoroughly knowledgeable about the law, and the facts, and from the Court's perspective he made intelligent, strategic choices in this case. And I find that he, in fact, performed far above the prevailing norms."

Balbuena's declaration did not materially differ from her lawyer's account. She alleged that she told Mr. Foster that Morris had burned her once with a cigarette, but she also claimed Morris explained it was an accident. She referred to Morris pushing her around, knocking her out of the way, and slapping her once. But the trial court found her statements were not credible in light of the inconsistencies between her declaration, her testimony, and her statements to trial counsel and the marriage and family counselor. We must accept the trial court's credibility findings. (*In re Alcox* (2006) 137 Cal.App.4th 657, 665, 40 Cal.Rptr.3d 491.)

We pointed out at the beginning of our discussion that the marriage and family counselor found 98 percent of the women she interviewed were victims of IPB. Thus, she has an extremely expansive understanding of what constitutes intimate partner battering. Moreover, she did not interview Balbuena until after the jury had returned its verdicts against her. Both her perception, as well as that of Balbuena, would have been very different after the murder verdict was returned from the perspective of a lawyer assessing his tactics as he prepared for trial.

It is the lawyer's vantage point before trial that is the measuring stick. Whether or not only two women out of each hundred she speaks to are fortunate enough to escape abuse, as the counselor believes, or whether every defendant accused of murder should be entitled to a mental health examination, as the "expert" lawyer believes, we must accord defense counsel sufficient deference to strategize on his client's behalf, based on the facts and the law as they are at the time of his trial preparation. Here, neither the facts nor the law compelled Balbuena's lawyer to consult with an IPB expert. His range of options, despite the experts' postmortems, was not as limited as Balbuena would have us find.

There were indeed few facts suggestive of an IPB defense, and the significance of even those facts was further diluted by the nature

1        and brevity of Balbuena's relationship with Morris.  In fact, there
was no reason to accept the premise of IPB, the existence of an
2        intimate partnership, since Morris rejected the notion of initiating
or maintaining a romantic relationship with Balbuena.  They were
3        roommates "with benefits"; that is to say, Morris was willing to
have sex with Balbuena but he was not duplicitous about his
4        motives or his expectations.  Balbuena told her lawyer consistently
that Morris did not love her and that it was she who coveted a
5        relationship he was unwilling to establish.

6        Moreover, given the paucity of evidence of physical abuse against
Balbuena, we will not fault a lawyer for rejecting a defense he
7        believed had no basis in fact.  Balbuena's demeanor and her
accounting of what had transpired throughout the time Morris
8        lived in the apartment supported the lawyer's reasonable belief.
Morris may have been ungrateful, crude, and disrespectful to
9        Balbuena and mean, even cruel, to her children, but there is so
little evidence he abused Balbuena that we must conclude
10       Balbuena's lawyer remained well within professional norms of
making an imminently reasonable tactical choice to forego the
11       defense.

12       Because we find that Balbuena failed to prove her counsel's
representation fell below an objective standard of reasonableness,
13       we need not consider whether the failure to hire an IPB expert was
prejudicial.  Simply put, her lawyer's decision to forego an IPB
14       defense was not deficient.  There was no ineffectiveness of
counsel.

15

16   Dckt. No. 15 at 67-80.

17        To support a claim of ineffective assistance of counsel, a petitioner must first show that,

18   considering all the circumstances, counsel's performance fell below an objective standard of

19   reasonableness.  *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).  After a petitioner

20   identifies the acts or omissions that are alleged not to have been the result of reasonable

21   professional judgment, the court must determine whether, in light of all the circumstances, the

22   identified acts or omissions were outside the wide range of professionally competent assistance.

23   *Id*. at 690; *Wiggins v. Smith*, 539 U.S. 510, 521 (2003).  "Counsel's errors must be 'so serious as

24   to deprive the defendant of a fair trial, a trial whose result is reliable.'"  *Richter*, 131 S.Ct. at 787-

25   88. (quoting *Strickland*, 466 U.S. at 687).  Surmounting the bar imposed by *Strickland* was

26   ////

1    "never an easy task," and "establishing that a state court's application of *Strickland* was

2    unreasonable under § 2254(d) is all the more difficult." *Id.* at 788.

3          Second, a petitioner must establish that he was prejudiced by counsel's deficient

4    performance. *Strickland*, 466 U.S. at 693-94.  Prejudice is found where "there is a reasonable

5    probability that, but for counsel's unprofessional errors, the result of the proceeding would have

6    been different."  *Id*. at 694.  A reasonable probability is "a probability sufficient to undermine

7    confidence in the outcome."  *Id.*  "The likelihood of a different result must be substantial, not

8    just conceivable."  *Richter*, 131 S.Ct. at 792.

9          Petitioner has failed to demonstrate that the Superior Court's decision rejecting her claim

10   of ineffective assistance of counsel is contrary to or an unreasonable application of *Strickland* or

11   *Richter*.  As explained by the California Court of Appeal, petitioner's trial counsel stated in his

12   declaration filed in support of petitioner's motion for new trial that he did not call an expert

13   witness on the subject of intimate partner battering because he did not believe the evidence was

14   sufficient to support such a defense.  After reviewing the trial evidence, the California Court of

15   Appeal agreed that the evidence did not indicate petitioner was battered or, more importantly,

16   that Morris' treatment of petitioner caused her to engage in acts that resulted in the death of her

17   child.  That determination was not "so lacking in justification that there was an error well

18   understood and comprehended in existing law beyond any possibility for fairminded

19   disagreement."  *Harrington*, 131 S. Ct. at 786-87.  Rather, it is carefully explained and well

20   supported by the record.  Trial counsel was not unreasonable in deciding not to pursue a defense

21   that was not supported by the evidence.

22         In addition, as noted by the California Court of Appeal, petitioner did not tell her attorney

23   that she was battered by Morris, except to say that she had been slapped one time.  Her failure to

24   apprise her trial counsel of facts that would have supported a defense of intimate partner

25   battering would, of course, have had an influence on his decision whether ot not to pursue such a

26   defense.  *See Strickland*, 466 U.S. at 691 ("the reasonableness of counsel's actions may be

29

determined or substantially influenced by the defendant's own statements or actions"); *Turk v.*
*White*, 116 F.3d 1264, 1267 (9th Cir. 1997) ("when the facts that support a certain potential line
of defense are generally known to counsel because of what the defendant has said, the need for
further investigation may be considerably diminished or eliminated altogether"); *Langford v.*
*Day*, 110 F.3d 1380, 1387 (9th Cir. 1996) (no ineffective assistance for failure to investigate
where client failed to tell attorney about relevant facts).

Further, reasonable tactical decisions, including decisions with regard to the presentation
of the case, are "virtually unchallengeable." *Strickland*, 466 U.S. at 687-90. "The decision
whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a
tactical decision of the sort engaged in by defense attorneys in almost every trial." *United States*
*v. Nersesian*, 824 F.2d 1294, 1321 (2nd Cir. 1987). Petitioner has failed to overcome the strong
presumption that her trial counsel's decision not to call an expert witness on intimate partner
battering was a reasonable tactical decision and sound trial strategy. *See United States v.*
*Opplinger*, 150 F.3d 1061, 1071-72 (9th Cir.1998), *overruled on other grounds* by *United States*
*v. Contreras*, 593 F.3d 1135 (9th Cir. 2010) (per curiam) (a decision not to call a witness based
upon sound logic and tactics does not constitute ineffective assistance of counsel); *Morris v.*
*California*, 966 F.2d 448, 456 (9th Cir.1991) (a tactical decision not to call a particular witness
cannot form the basis of a ineffective assistance of counsel claim, even if the defendant disagrees
with the decision). It is true that counsel "has a duty to make reasonable investigations or to
make a reasonable decision that makes particular investigations unnecessary." *Detrich v. Ryan*,
677 F.3d 958, 974 (9th Cir. 2012) (quoting *Strickland*, 466 U.S. at 691). However, in light of the
information known to counsel at the time of petitioner's trial, his decision not to conduct
extensive investigation into a defense based on intimate partner battering, or to call an expert
witness on this subject, was reasonable.

////

////

The decision of the California Court of Appeal rejecting petitioner's claim of ineffective assistance of trial counsel is not contrary to or an unreasonable application of federal law.  *Price*, 538 U.S. at 640.  Accordingly, petitioner is not entitled to relief on this claim.

**IV.  Conclusion**

For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case.  *See* Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED:  May 14, 2013.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE